# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MIGHTY DEER LICK, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17-cv-05875 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| MORTON SALT, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mighty Deer Lick, Inc. ("MDL") develops and markets deer licks and other animal feed products. Defendant Morton Salt, Inc. ("Morton") manufactures and sells salt products. The two companies first contracted in 1989 for Morton to produce salt blocks for animal feed. The arrangement called for Morton to use MDL's formula and trademarks to produce salt bricks solely for sale to MDL; meanwhile, MDL retained the right to use its marks in the direct sale of its products to existing customers, and Morton agreed to police MDL's marks and cease using them upon termination of the agreement. In 2015, Morton served notice of its termination of the agreement to MDL. According to MDL, before the parties ended their business relationship, Morton had failed to hold up its end of the bargain, which required Morton to manufacture quality product, police MDL's mark, and attempt to increase sales. MDL further claims that following termination of the agreement, Morton has continued to sell product using MDL's formula and marks and refuses to return property belonging to MDL. Accordingly, MDL has filed a 16-count complaint against Morton, alleging claims for breach of contract (Count I), tortious interference with a business relationship (Count II) and with contract (Count III), misappropriation of trade secrets (Counts IV and V), trademark infringement (Counts VI, XI, and

XII), trademark dilution (Counts VII, VIII, and XIII), unfair competition (Counts IX and X), trade dress infringement (Count XIV), unjust enrichment (Count XV), and conversion (Count XVI). Now before the Court is Morton's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 22.) For the reasons explained below, the motion is granted in part and denied in part.

## BACKGROUND

For the purposes of Morton's motion to dismiss, this Court accepts as true all well-pleaded facts in the Complaint and views those facts in the light most favorable to MDL. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

In 1989, the parties first entered into an agreement for Morton to produce salt licks and other products using MDL's formula and bearing MDL's marks. (Compl. ¶¶ 20, 42, 51, Dkt. No. 1.) The agreement allowed both companies to profit by reaching more customers, since MDL's marks were well-known within the animal feed community as signals of quality. (*Id*. ¶ 16.) Pursuant to their arrangement, MDL furnished Morton with the formula, marks, and mold dies necessary to manufacture MDL's flavored blocks. (*Id*. ¶¶ 42, 51.) The parties signed amendments to the agreement in 2001 and 2004 that described MDL's protected marks in detail and provided Morton with a license to sell products bearing MDL's marks in Canada. (*Id*. ¶¶ 22–25, 31.)

In 2009, Morton was acquired by K+S Atkiengesellschaft, a German corporation. (*Id*. ¶ 32.) Between 2009 and 2015, the relationship between MDL and Morton began to sour. Morton began manufacturing poorly-made products with MDL's marks, changed MDL's formula without its consent, and failed to try to expand sales or police infringement of MDL's marks. (*Id*. ¶¶ 39, 43, 46, 59.) On August 7, 2015, Morton notified MDL that it was terminating

the parties' agreement, effective October 4, 2016. (*Id.* ¶ 33.) But Morton refused to stop selling products imprinted with MDL's marks or return mold dies used to manufacture MDL-branded products despite repeated demands by MDL to do so. (*Id.* ¶¶ 52, 55.)

At the time this lawsuit was filed, Morton was still manufacturing and selling products with MDL's marks without MDL's authorization as part of a concerted effort to squeeze MDL out of the animal feed market. (*Id.* ¶¶ 63–69.) Moreover, Morton continues to sell products under MDL's marks without MDL's consent and has adopted a mark so similar to MDL's mark that Morton risks confusing customers and diluting MDL's brand. (*Id.* ¶¶ 55, 67–69.) Unable to convince Morton to cease use of MDL's marks or return MDL's property, MDL has filed the instant lawsuit.[1]

## DISCUSSION

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint need not include detailed factual allegations, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Even so, a plaintiff need provide "only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and,

---

[1] This Court has subject-matter jurisdiction due to the claims arising under federal law, *see* 28 U.S.C. § 1331, and exercises supplemental jurisdiction over the state-law claims, *see* 28 U.S.C. § 1367(a). The parties have not briefed the choice-of-law issue. Morton analyzes the common-law claims under both Michigan and Illinois law, while MDL relies on Illinois law in its response. The Court finds that at the pleading stage, the minor differences between Michigan and Illinois law are irrelevant. *Compare Reger*, 592 F.3d at 764 (party asserting breach of contract must allege a contract, breach by defendant, damages, and substantial performance by the plaintiff), *with Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014) (party asserting breach of contract must show there was a contract that the other party breached resulting in damages). But as the case progresses, the parties should be prepared to take a position as to whether Illinois or Michigan law governs the state-law claims.

through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (internal quotation marks omitted).

### I. Breach of Contract Claim (Count I)

The Court begins with MDL's breach of contract claim in Count I. Under Illinois law, to state a breach of contract claim, MDL must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger*, 592 F.3d at 764.

In the Complaint, MDL has alleged that (1) Morton contracted with MDL to manufacture products for MDL, (2) Morton violated the terms of the contract by, among other things, selling defective products and failing to police use of MDL's trademark, and (3) MDL lost sales and product placement in third-party retailers because of Morton's breach. (Compl. ¶¶ 41, 50, 81–84.) MDL has also attached as exhibits to the Complaint the 1989 Agreement, the 2001 License Agreement, and the 2004 amendment. (Compl. Exs. A, B, C, Dkt. Nos. 1-1–1-3.) Since exhibits attached to a complaint are incorporated into the pleading for purposes of Rule 12(b) motions, the Court may consider these documents in ruling on Morton's motion. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452–53 (7th Cir. 1998).

Morton argues that MDL has failed to plead sufficient facts in support of its breach of contract claim. But MDL is not required to plead "all the specific details" underlying its claim. *Axiom Ins. Managers Agency, LLC v. Indemnity Ins. Corp.*, No. 11 C 2051, 2011 WL 3876947, at *12 (N.D. Ill. Sept. 1, 2011). That MDL has not alleged specific contractual terms that were violated, for example, does not preclude the claim. Plausibility simply requires "enough facts to raise to a reasonable expectation that discovery will reveal" evidence supporting the plaintiff's

claims. *Twombly*, 550 U.S. at 556. MDL has provided enough information to put Morton on notice of the nature of the claim and the grounds upon which it rests. MDL has therefore adequately stated a claim for breach of contract and Morton's motion to dismiss Count I is denied.

  **II.**  **Tortious Interference Claims**

    **A.**  **Tortious Interference with a Business Relationship (Count II)**

In Count II, MDL asserts a claim for tortious interference with a business relationship. Illinois courts refer to that tort as tortious interference with a prospective economic advantage, which is established when a plaintiff proves:"(1) [its] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991).

Morton argues that MDL's claim for tortious interference with a prospective economic advantage fails because MDL has not properly identified the third parties with which MDL had business relationships. But MDL is not required to identify the specific third parties at this stage in the litigation. *See Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998) (finding that the plaintiff had no obligation to allege the specific third party with whom he had a valid business expectancy). MDL's allegation that it had business relationships with third parties—taken in concert with the allegations regarding MDL's ability to make direct sales of products to existing customers—provides sufficient factual detail for the Court to infer that MDL reasonably expected to enter into or was already involved in business relationships with third parties.

MDL also satisfies the remaining elements of a claim for tortious interference with a prospective economic advantage. MDL has alleged both that Morton knew of MDL's expectation to engage in business relationships with third parties and that the contract between MDL and Morton explicitly gave MDL the right to sell to third parties. (Compl. ¶¶ 25, 88.) Additionally, MDL claims that Morton intentionally coerced third parties to "terminate, breach a contract, or withhold a valid business expectancy" from MDL as part of Morton's effort to "squeeze" MDL out of the market. (*Id.* ¶¶ 63, 89.) Finally, MDL alleges that Morton's interference caused injury and damages to MDL. (*Id.* ¶ 91.) In various parts of the Complaint, MDL refers to lost sales and product placement with third-party retailers as a result of Morton's failure to comply with the contract. (*See id.* ¶¶ 41, 50.) Given that MDL also alleges that Morton has attempted to take over MDL's contracts with other parties—and thus co-opt MDL's sales for itself—it is reasonable to infer that the harms suffered by MDL take a similar form. Taken altogether, MDL's allegations adequately support its claim of tortious interference with a prospective economic advantage. Therefore, Morton's motion to dismiss Count II is denied.

### B. Tortious Interference with Contract (Count III)

To establish a claim for tortious interference with contract under Illinois law, as alleged in Count III, a plaintiff must show:

> (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach by the other, caused by the defendant's wrongful conduct, and (5) damages.

*Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 731 (7th Cir. 1999) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)).

Morton argues that MDL fails to identify either the breached contract or the specific contracting party. But there is no requirement that MDL do so at this stage of the litigation. The case Morton cites in support of its assertion to the contrary does not actually reach that issue. *See Timmis v. Sulzer Intermedics, Inc.*, 157 F. Supp. 2d 775, 778 (E.D. Mich. 2001) (finding that the plaintiff's claim for tortious interference with contract failed because "[t]here [was] nothing in Plaintiff's complaint that supports a claim that Defendants somehow tortiously interfered with this contract" and the agreement was terminated due to the third party's choice rather than any tortious interference by Defendants). Here, MDL alleges that Morton took over MDL accounts and coerced third parties to breach their contracts with it. That is sufficient. Morton's argument therefore fails.

MDL alleges that it had valid contracts with third parties, Morton had knowledge of those contracts, and Morton intentionally (and without authorization) coerced the third parties with whom MDL contracted to terminate the contracts. (Compl. ¶¶ 94–97.) While these may be conclusory statements, MDL provides enough factual support elsewhere in its Complaint to support those conclusions. Specifically, MDL alleges that Morton used a conduit company to take over MDL's contract with another party and entirely took over an important MDL client account. (*Id.* ¶¶ 57, 60.) In short, MDL's allegations rise above "threadbare recitals" of the elements of tortious interference with contract and put Morton sufficiently on notice of MDL's claim. The details may be readily fleshed out during discovery. Morton's motion to dismiss Count III is therefore denied.

### III. Trade Secrets Claims (Counts IV and V)

MDL asserts trade secret misappropriation claims under both the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831, *et seq.*, and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065. MDL brings these claims in Counts IV and V, respectively.

The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). It defines a trade secret as including:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). To state a claim for misappropriation under the statute, a plaintiff must show that the defendant used or disclosed the trade secret without the plaintiff's consent and (1) improperly acquired the secret or (2) knew or had reason to know at the time of disclosure that the trade secret was acquired through improper means. *See Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 920 (N.D. Ill. 2016) (citing 18 U.S.C. § 1839(5)).

The ITSA's requirements are broadly similar to those of the DTSA, absent the need for involvement in interstate or foreign commerce. A plaintiff claiming a violation of the ITSA must show that the information at issue was a trade secret, the defendant misappropriated it, and the

defendant used the information in its business. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721–22 (7th Cir. 2003) (providing the statutory definition and construing a trade secret broadly as information sufficiently secret to derive economic value and subject to reasonable efforts to maintain its secrecy); *Arcor, Inc. v. Haas*, 842 N.E.2d 265, 269 (Ill. App. Ct. 2005).

In seeking dismissal of the federal and state trade secret claims, Morton first argues that MDL has failed to plead the existence of a trade secret. Specifically, Morton claims that MDL has not alleged it took reasonable measures to maintain the confidentiality of its trade secrets, identified its trade secrets with sufficient detail, or shown that its trade secrets had independent economic value.

It is true that MDL must allege concrete secrets—in its Complaint, MDL must provide enough detail for both the Court and Morton to be on notice as to what the trade secrets are. *See AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 920 (N.D. Ill. 2001) (citing *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992)). And MDL's laundry list of "trade secrets" alone does not satisfy this requirement, as MDL claims as trade secrets methods of manufacturing, packaging, and compiling customer lists but provides no further detail. (*See* Compl. ¶ 111.) However, MDL *does* allege enough to claim its product formula as a trade secret, as MDL alleges that the formula specifically provides the means for manufacturing the very animal licks, bricks, blocks, and home meat curing kits at issue in this case. (*Id*. ¶¶ 24, 42.) As a result, MDL's trade secret claims with respect to the product formula survive a motion to dismiss. At the pleading stage, MDL need not provide extensively-detailed descriptions of the nature of its trade secrets; indeed, doing so would likely subvert the very purpose of seeking to protect a trade secret. *See Covenant Aviation Sec., LLC v. Berry*, 15 F.

Supp. 3d 813, 818 (N.D. Ill. 2014) (requiring detailed disclosure would expose purported trade secrets to the public).

Morton also contends that MDL has failed to allege adequately that its trade secrets were used in any Morton product intended for use in interstate or foreign commerce, thereby failing to allege that required element under the DTSA. But MDL alleges enough for the Court to reasonably infer that MDL's goods were used in or intended for use in interstate commerce. The 2001 License Agreement provided for the sale of MDL products in Canada. (Pl.'s Resp., Dkt. No. 42 at 7–8.) The Court can therefore infer that MDL sold or intended to sell its products outside of the United States. Moreover, since the parties explicitly amended the contract to allow for goods crossing state and international borders, it is reasonable to infer that they did so. And given that MDL products are sold in a variety of chain stores not confined to the state of Michigan, it is plausible that MDL's products cross state lines. *See, e.g.*, *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *3 (N.D. Ill. July 31, 2017) (inferring from parties' actions in preparing a contract that goods were intended for interstate commerce).

MDL has also satisfied the remaining requirements to plead a trade secrets claim based on its product formula. Specifically, MDL alleges that Morton misappropriated the product formula in using it to sell its own products and that Morton is now using the information to sell Morton-branded items. (Compl. ¶¶ 58, 65.) Taken together, MDL's allegations put Morton on notice of its trade secrets claims with respect to the product formula. Viewing the facts and all reasonable inferences in MDL's favor, MDL has plausibly alleged that Morton misappropriated the relevant trade secrets and states a claim under both the DTSA and ITSA. The Court therefore denies Morton's motion to dismiss Counts IV and V.

## IV. Trademark Infringement Claims (Counts VI, VIII, XI, XII, VIII, and X )

MDL alleges that Morton's unauthorized use of products bearing MDL marks constitutes trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125; the Illinois trademark statute, 765 ILCS 1036/60; and common law. MDL's three trademark infringement claims all arise from the same conduct, and Morton's arguments for dismissal are essentially the same for all three claims. Moreover, since MDL's unfair competition claim seeks to hold Morton liable for copying and using MDL's marks, it essentially duplicates MDL's trademark infringement claims. The Court accordingly analyzes all four claims simultaneously.

To state a trademark infringement claim, a plaintiff must allege that: (1) the mark at issue is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers. *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). MDL has satisfied those elements by alleging that its marks are federally registered with the USPTO, which creates a rebuttable presumption that the marks are valid, *Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011), and further that MDL is using a "copy or colorable imitation" of MDL's marks in a manner calculated to deceive consumers. (Compl. ¶¶ 122–23.)

Morton asserts two main grounds for dismissal of the trademark infringement claims: that MDL has failed to identify the infringing use of its marks and that MDL has not established the likelihood that customers will be confused by Morton's use.

The likelihood of confusion analysis is comprised of seven factors:

(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another.

*Packman*, 267 F.3d at 643 (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897–98 (7th Cir. 2001)). Since the likelihood of confusion test is a fact-intensive one, it "ordinarily does not lend itself to a motion to dismiss." *Slep-Tone Entm't Corp. v. Coyne*, 41 F. Supp. 3d 707, 715 (N.D. Ill. 2014) (internal quotation marks omitted). This Court therefore limits its inquiry to whether MDL has pleaded enough facts plausibly to suggest that it could succeed on the likelihood of confusion portion of its claim.

MDL makes no attempt to allege facts regarding either the fourth factor, degree of care likely to be exercised by consumers, or the sixth one, actual confusion. Still, the complaint does allege factors regarding the first factor, similarity of the marks, albeit rather vaguely: MDL claims that Morton adopted a mark "confusingly similar" to MDL's and that Morton is using an imitation of MDL's marks. Had MDL alleged nothing else, these conclusory statements would be insufficient to satisfy the first factor. But MDL's complaint repeatedly mentions that Morton is selling products with MDL's exact mark. Drawing inferences in MDL's favor, it is plausible that Morton is using marks that are identical to the ones detailed by MDL in its Complaint, thus satisfying the first factor. A similar analysis governs the second factor: similarity of the products. MDL's complaint alleges that Morton originally contracted to make deer lick with MDL's mark, that Morton is now selling products with MDL's mark, and that Morton is trying to squeeze MDL out of the market. The Court can plausibly infer that MDL and Morton are both attempting to sell an identical product: deer lick. Since identical products are undoubtedly similar ones, MDL has alleged facts supporting the presence of the second factor.

The complaint also alleges facts regarding the third factor: area and manner of concurrent use. According to MDL, Morton has been selling to MDL's exclusive accounts, trying to enter the animal-feed supply business and "squeeze out" MDL, and selling under MDL's marks.

(Compl. ¶¶ 60, 63, 65–67.) Again, drawing all reasonable inferences in MDL's favor, the Court can conclude that Morton is attempting to target precisely the same market as MDL. MDL thus has alleged facts to support the third factor.

MDL also pleads facts in support of factors five, strength of plaintiff's mark, and seven, whether a defendant is palming off its product as plaintiff's product. MDL alleges that its mark is widely recognized as being associated with MDL and high-quality goods. This is enough to allege that MDL's mark is distinctive, or easily capable of identifying the products sold as emanating from a certain source. *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 684–85 (7th Cir. 2001). Regarding the seventh factor, MDL alleges that Morton is using a copy of MDL's marks with the intent to deceive consumers. (*See* Compl. ¶¶ 66–69, 122–23.) The Court can reasonably infer that Morton is attempting to pass off its own products as those of MDL by trading off MDL's reputation. (*See id*. ¶¶ 16, 19, 65.)

While MDL makes a weak or nonexistent showing for at least two factors, what matters is whether MDL has shown enough to survive a motion to dismiss. Here, since MDL has managed to allege facts pertinent to five of the seven factors, it has pleaded enough to plausibly suggest that it could prevail on the likelihood of confusion test. *See, e.g.*, *Slep-Tone*, 41 F. Supp. 3d at 717 (finding that a complaint that failed to allege three of the seven factors still pleaded enough to survive a motion to dismiss). Accordingly, Morton's motion to dismiss Count VI, Count XI, Count XII, Count VIII, and Count X is denied.

V.     **Trademark Dilution Claims (Counts VII, VIII, and XIII)**

In Counts VII and XIII, MDL claims that Morton is liable for trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c).[2] To state a claim for trademark dilution, MDL must allege

---

[2] The original complaint asserts two counts ("Count VII – Trademark Dilution – 15 U.S.C. §§ 1125(c) and 1127" and "Count XIII – Dilution of Trademark") of trademark dilution but provides no alternative

13

that (1) its marks are famous; (2) Morton adopted its mark after MDL's marks became famous; (3) Morton's mark is likely to cause dilution of MDL's marks; and (4) Morton is using its mark in commerce for commercial purposes. *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000). The harm of trademark dilution "stems from a trademark losing its ability to trigger an association in consumers' minds between the trademark and a particular producer of goods or services." *See Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 785 (N.D. Ill. 2011). Courts recognize two main forms of dilution: tarnishing, in which the similarity of marks causes consumers mistakenly to associate the plaintiff's famous mark with the defendant's inferior one, and blurring, in which seeing the plaintiff's mark used on many goods means it no longer serves as a unique identifier of the plaintiff's products. *E.g., Eli Lilly*, 233 F.3d at 466.

Morton contends that MDL has failed to describe any infringing activity by Morton. While MDL's claim does not specify which theory of dilution it pleads, the allegations in the Complaint are sufficient to state a claim for dilution by tarnishing. First, MDL alleges that its mark is widely recognized as associated with MDL and "high quality goods." (Compl. ¶ 16.) Second, MDL alleges that Morton was well aware of MDL's use of the mark before Morton started selling products with an identical or similar mark. (*Id*. ¶ 131.) Third, MDL alleges that Morton's commercial use of MDL's marks "lessens the capacity" of such marks to identify and distinguish MDL's goods. (*Id*. ¶ 132.) Taken together with MDL's allegations that Morton's purpose is to deceive consumers, the Court can plausibly infer that the similarity of Morton's mark to MDL's marks is causing consumers to associate the two mistakenly. (*Id*. ¶ 133.) Finally, MDL alleges that Morton is selling products using MDL's trademarks—such a use is

---

source of law or cause of action justifying the splitting of one claim. The Court therefore construes these two parts as a single claim for trademark dilution under 15 U.S.C. §§1125(c).

undoubtedly commercial in nature. (*Id*. ¶ 55.) MDL's allegations therefore give rise to a plausible trademark dilution claim.

While Morton again argues that MDL has failed to provide enough facts in support of its allegations, MDL is not required to detail the full extent of its advertising in support of its mark or specify the precise degree of its marks' distinctiveness. MDL's allegations and the reasonable inferences from those allegations are sufficient to plead a trademark dilution claim against Morton. The Court therefore denies Morton's motion to dismiss with respect to Counts VII, VIII, and XIII.

## VI. Trade Dress (Count XIV)

To state a claim for trade-dress infringement, MDL must plausibly allege that (1) its trade dress is nonfunctional, (2) its trade dress has acquired secondary meaning, and (3) there exists a likelihood of confusion between MDL's trade dress and Morton's trade dress. *Incredible Techs., Inc. v. Virtual Techs., Inc.,* 400 F.3d. 1007, 1015 (7th Cir. 2005).

Morton contends that MDL has failed to describe its trade dress sufficiently. MDL counters by pointing out that its complaint alleges that MDL "created a uniquely designed product" that included a means of carrying salt blocks and a "unique and distinctive appearance" familiar to Morton. (*See* Compl. ¶¶ 191–92.) Indeed, MDL correctly observes that the standard for federal notice pleading is not a lofty one. And courts examine the "overall appearance" of trade dress rather than focus on comparing minute details of competing products in evaluating claims. *See August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 620 (7th Cir. 1995). But MDL must provide enough detail to put Morton on notice as to what MDL believes constitutes its protectable trade dress. *See Weber-Stephen Prods. LLC v. Sears Holding Corp.*, No. 13-cv-01686, 2013 WL 5782433, at *3–4 (N.D. Ill. Oct. 25, 2013) (explaining that plaintiffs must

identify and describe trade dress in *some* detail to survive a motion to dismiss). MDL's products may well be "uniquely designed," but without more factual detail, neither the Court nor Morton can identify the distinct features that would comprise a protectible trade dress. One manner of doing so could be to allege some details regarding the protectible trade dress and attaching images of the products exhibiting the trade dress—as did the plaintiffs in *Dynamic Fluid Control (PTY) Ltd. v. International Valve Manufacturing, LLC*, 790 F. Supp. 2d 732, 737 (N.D. Ill. 2011), and *Weber-Stephen Products*, 2013 WL 5782433, at *4—although this certainly is not the only way to do so. In any case, simply stating that a product is unique is not sufficient to state a claim for trade dress infringement. MDL's trade dress claim in Count XIV is therefore dismissed without prejudice.

### VII. Unjust Enrichment (Count XV)

In Count XV, MDL asserts an Illinois common law claim for unjust enrichment. Illinois courts recognize unjust enrichment as an independent cause of action. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (citing *Raintree Homes, Inc. v. Vill. of Long Grove,* 807 N.E.2d 439, 445 (Ill. 2004)). But a plaintiff may pursue an unjust enrichment claim in the presence of a written contract between the parties only if the claim sounds in tort, rather than in quasi-contract. *See Peddinghaus v. Peddinghaus*, 692 N.E.2d 1221, 1225 (Ill. App. Ct. 1998).

Morton seeks to dismiss MDL's unjust enrichment claim, citing MDL's failure to plead a claim based on tortious conduct outside of the express contract between the two parties. In response, MDL points to its conversion claim and argues that unjust enrichment can be predicated on an underlying conversion claim. While MDL correctly states the law, the conversion claim is not what the Complaint purports to use as its basis for the unjust enrichment claim. Rather, the Complaint contends that Morton received an improper benefit from selling

16

deer licks and using MDL's trademarks without approval. (*See* Compl. ¶¶ 200–01.) This contention goes to the heart of MDL's breach of contract claim, which accuses Morton of, among other things, "[u]sing MDL's marks in an unauthorized manner." (*Id*. ¶ 83.) MDL cannot now raise in its response to Morton's motion to dismiss the new notion that the conversion claim is, in fact, the basis for the unjust enrichment claim. MDL's unjust enrichment claim in Count XV is therefore dismissed without prejudice.

### VIII. Conversion Claims (Count XVI)

In Count XVI, MDL asserts a claim for conversion. To state a claim for conversion under Illinois law, a plaintiff must allege that (1) the defendant wrongfully and without authorization assumed control of the plaintiff's property, (2) the plaintiff has a right to the property, (3) the plaintiff has the right to immediate possession of the property, and (4) there has been a demand for possession of the property. *Gen. Motors Corp. v. Douglass*, 565 N.E. 2d 93, 96–97 (Ill. App. Ct. 1990). Conversion centers around the wrongful deprivation of the owner's right to property; a plaintiff claiming conversion need only show that the defendant is exercising control over the disputed property "in a manner inconsistent with plaintiff's right of possession." *Jensen v. Chi. & W. Ind. R.R. Co.,* 419 N.E.2d 578, 593 (Ill. App. Ct. 1981).

MDL contends that Morton has refused to return mold dies that MDL provided to Morton for producing salt blocks.[3] Morton counters that MDL has failed to plead facts in support of MDL's ownership of the mold dies or Morton's refusal to return them. But MDL specifically alleges that (1) Morton refuses to return MDL's mold dies and continues to use them, (2) MDL is

---

[3] While MDL also refers in Count XVI to improperly withheld royalties and payments, a conversion claim is not a remedy to seek payment of a debt. *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 614–15 (7th Cir. 2013). MDL makes no allegation to suggest they seek anything other than to satisfy an obligation to pay money. This Court therefore construes Count XVI as a claim for conversion solely with respect to the mold dies.

the rightful owner of the property, and (3) Morton has rebuffed repeated demands by MDL for the return of the dies. (Compl. ¶¶ 52–54, 205, 207.) As alleged, MDL is unable to use its mold dies because of Morton's wrongful possession. This is the "essence" of a conversion claim. *See Jensen*, 419 N.E. 2d at 593 ("The essence of conversion is not acquisition by the wrongdoer but a wrongful deprivation of the owner thereof.").

While MDL has not explicitly stated that it has a right to immediate possession of the property, the factual allegations in the Complaint allow the Court to draw the reasonable inference that MDL has such a right. MDL allegedly furnished Morton with mold dies when the parties entered into their contract, presumably so that Morton could manufacture products for MDL as agreed. Morton would have no need for the mold dies outside of the contractual relationship. Since MDL alleges that it demanded the items back upon Morton's termination of the contract and that Morton has "improperly and without permission" retained and used the mold dies, it is reasonable to infer from MDL's statements and actions that MDL intended for Morton only to possess the mold dies for the duration of the contract and therefore has the right to their immediate possession. (*Id*. ¶¶ 53–54.) Taken together, the allegations are sufficient to put Morton on notice of MDL's conversion claim. Morton's motion to dismiss MDL's conversion claim in Count XVI is thus denied.

### IX. Statute of Limitations

Finally, Morton challenges MDL's claims as untimely. Because the statute of limitations is an affirmative defense, courts generally do not dismiss claims at the pleadings stage for failure to be brought within the statute of limitations. *See Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613 (7th Cir. 2014). For dismissal to be warranted, the complaint's allegations must plainly reveal that an action is untimely under the governing statute of

limitations. *Id.* at 613–14. Courts should deny motions to dismiss when there is "any set of facts that if proven would establish a defense to the statute of limitations." *Clark v. City of Braidwood*, 318 F.3d 764, 768 (7th Cir. 2003).

Here, it is not obvious that MDL's allegations solely pertain to actions taken outside the relevant statutes of limitation for any of the counts in question.[4] MDL alleges that Morton notified MDL on August 7, 2015, that Morton would be terminating the parties' agreement. (Compl. ¶ 33.) MDL filed its Complaint on August 11, 2017. Given that MDL found the contract termination a "surprise," there is no basis from which the Court may conclude that MDL had notice of its trademark infringement, trademark dilution, or conversion claims prior to that point in time. MDL therefore filed its Complaint within the three-year statute of limitations for these sets of claims.

It is less clear when MDL would have been on notice for its breach of contract, tortious interference, or trade secrets claims. It is possible to read MDL's allegations as suggesting the relevant conduct, and MDL's awareness of it, took place many years before Morton ended the contract and therefore well outside the relevant statutes of limitations. But it also plausible that MDL's allegations are timely. One can reasonably infer that Morton did not attempt to interfere

---

[4] The relevant statues of limitations are:
Count I (Breach of Contract): 10 years, 735 ILCS 5/13–206;
Counts II/III (Tortious Interference): 5 years, *see Poulos v. Lutheran Social Services of Illinois, Inc.*, 728 N.E.2d 547, 559 (Ill. App. Ct. 2000);
Count IV (DTSA): 3 years, 18 U.S.C. § 1836(d);
Count V (ITSA): 5 years, 765 ILCS 1065/7;
Counts VI, VII, VIII, IX, X, XI, XII, XIII, and XIV (Trademark Infringement, Trademark Dilution, and Unfair Competition): 3 years, *see S&A Futures, LLC–Series 2 v. Sysco Chicago, Inc.*, No. 11 C 7629, 2012 WL 851556, at *3 (N.D. Ill. Mar. 13, 2012) (citing *Chattanoga Mfg., Inc. v. Nike, Inc*., 301 F.3d 789, 793 (7th Cir. 2002));
Count XV (Unjust Enrichment): 5 years, 735 ILCS 5/13–205; and
Count VII (Conversion): 3 years, *see Kidney Cancer Ass'n v. North Shore Community Bank and Trust Co.*, 869 N.E.2d 186, 189 (Ill. App. Ct. 2007).

with MDL's third-party relationships until after the contract terminated: squeezing MDL out of the market would probably not have made sense when Morton was still manufacturing products for MDL. It is also plausible that Morton did not misappropriate MDL's formula for its own purposes until after the contract had ended: before then, Morton was using the formula at MDL's direction. Finally, it possible that MDL was not on notice that Morton was breaching the contract until after 2007. MDL was surprised that Morton was ending a mutually profitable business relationship; presumably MDL would have been less surprised if it had been aware that Morton was failing to uphold its end of the bargain. It may very well be that discovery reveals many of MDL's claims to be untimely. But because MDL's claims are not clearly untimely and the Court can plausibly infer that they might fall within the relevant statutes of limitations, the Court will not find MDL's complaints to be time-barred at this time. Morton's motion to dismiss on the basis of statute of limitations grounds is therefore denied.

## CONCLUSION

For the foregoing reasons, Morton's motion to dismiss the Complaint (Dkt. No. 22) is granted in part and denied in part. Specifically, the motion is granted with respect to Counts XIV and XV only. Those claims are dismissed without prejudice. The motion is denied with respect to Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, and XVI.

ENTERED:

Dated: February 11, 2020

_____

Andrea R. Wood
United States District Judge